# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

INSULET CORPORATION,

    Plaintiff,

    v.

BASIL ALI MOHAMMED SAMARA,

    Defendant.

Case No. 8:25-cv-3277-KKM-LSG

**ORAL ARGUMENT REQUESTED**

## PLAINTIFF INSULET CORPORATION'S
## MOTION FOR A PRELIMINARY INJUNCTION
## <u>AND INCORPORATED MEMORANDUM OF LAW</u>

## INTRODUCTION

Defendant Basil Ali Mohammed Samara worked at Insulet for ten years in a position that granted him access to relationships, special training, and confidential information related to Insulet's market-leading sales system.  In recognition of the competitively valuable nature of the training and knowledge Insulet had entrusted to him, Mr. Samara agreed he would not compete against Insulet for a period of at least one year following the end of his employment at Insulet.  Mr. Samara has breached that agreement.  Within three months of leaving Insulet, Mr. Samara joined one of Insulet's most significant competitors, Tandem Diabetes Care, Inc. ("Tandem"), and appears to be providing services to Tandem similar to those he learned through his position of trust at Insulet.  Insulet now seeks a preliminary injunction to enforce the protective covenant to which Mr. Samara agreed, and to prevent further irreparable harm his continued breach will cause.

## STATEMENT OF FACTS

### I.    Insulet Pioneered a Pharmacy Sales Channel After Years of Investment

Insulet was founded in 2000 by an entrepreneur, John Brooks, whose young son had been diagnosed with Type 1 diabetes.  Type 1 diabetes is a condition where the body cannot produce enough insulin to regulate blood glucose levels.  People with Type 1 diabetes require daily administration of insulin to maintain their blood glucose within target levels.  Mr. Brooks was dissatisfied with the options available for daily insulin treatment, which at the time were limited to multiple daily injections with a needle or insulin pump devices that attach to an infusion set on the body via

cumbersome tubing.  He founded Insulet with a mission to improve the lives of people with diabetes.  That founding mission led to Insulet's development of the world's first tubeless, wearable, disposable insulin patch pump—the Omnipod®—a revolutionary device that delivers insulin without the encumbrance of exposed tubing required by other pump devices.

Insulet's founding mission continues to drive its innovation today.  Insulet is the first insulin delivery device company to make its products broadly available to patients through traditional pharmacy channels rather than through specialized medical equipment providers.  Before Insulet began its pharmacy initiative, most private insurers treated the Omnipod as "durable medical equipment" covered under patients' medical benefits rather than traditional pharmacy benefits.  Patients who wished to obtain an Omnipod could do so only by contacting Insulet directly and working with a representative to gather the required medical and insurance documentation to fill a prescription, or by visiting an insurer-approved durable medical equipment ("DME") supplier.  Alparone Decl. ¶¶ 7-9.  That sales method was well-established in the industry; Insulet's competitors also sold their insulin delivery devices through DME channels, and tried to facilitate patient access by helping them navigate their insurance benefits and requirements.  *Id.* ¶ 8.

While well-established, the DME channel had its drawbacks.  For example, insurance providers would often impose burdensome eligibility requirements for DME coverage, such as requiring patients to enter into multi-year contracts or pay high upfront costs.  DME channels also had onerous documentation requirements such as

requiring extensive evidence of medical need, which often resulted in long delays in getting a device.  Each of these hurdles burdened patients and restricted access to the Omnipod in ways Insulet hoped to alleviate.  Alparone Decl. ¶¶ 9-12.

Beginning in 2017, Insulet pioneered a shift away from traditional DME distribution channels toward pharmacy prescription fulfillment channels.  The transition from DME to pharmacy-based distribution enables Omnipod users to obtain insulin delivery devices through conventional retail, specialty, and mail-order pharmacies rather than navigating the slower, more restrictive DME process.  This transition dramatically improved patient access by lowering logistical hurdles and barriers.  Alparone Decl. ¶ 13.

Achieving that transition took years of work.  Insulet had to identify and understand the various needs and limitations of the many stakeholders in the pharmacy prescription fulfillment network: patients, healthcare providers, wholesalers, distributors, retailers, pharmacy benefit managers, and payors.  To make the shift to pharmacy possible, Insulet had to change how insurers covered the Omnipod, how physicians prescribed the Omnipod, how patients filled their prescriptions, and how the Omnipod flowed from Insulet through different intermediaries and channels to reach patients at pharmacies.  Alparone Decl. ¶¶14-15.

Establishing each of the nodes required in a pharmacy sales network and designing the ways in which they should connect took years of data analysis, negotiation, relationship-building, and trial and error.  Insulet's market access team broke new ground negotiating with insurance payors and pharmacy benefit managers

to get the Omnipod covered under pharmacy benefits rather than under medical benefits only. Alparone Decl. ¶¶ 8, 21. Insulet's pharmacy operations team assessed internal Insulet financial and pricing data to design patient assistance programs and pricing models to make the fulfillment process and insurance navigation as seamless as possible at the pharmacy. *Id.* ¶¶ 7, 11. Insulet's inside sales team conducted research with patients and healthcare providers to determine what education, messaging, and support services they needed to move to and navigate the new pharmacy system. *Id.* ¶ 15. Insulet's distribution team worked with various wholesalers and distributors to connect the nodes of the product distribution channel—from Insulet warehouses to wholesalers to distributors to pharmacies. *Id.* ¶ 16. And all of the teams worked together across functions to design, negotiate, and implement the various flows of information, payments, and product between the parts of the system. *Id.*

Operationalizing the pharmacy channel was another challenge. Even with the payors, distributors, and pharmacies set up to fill a prescription at the pharmacy, the system involved various steps and checkpoints that had to happen in the right sequence to prevent delays. Applying its years of accumulated learning, Insulet designed a process to regulate those steps and partnered with a service partner, ASPN Pharmacies LLC ("ASPN") to execute its unique program. Insulet's program enables ASPN to centralize various tasks required to fill a prescription for Omnipod at the pharmacy. Alparone Decl. ¶¶13, 18; Sleeth Decl. ¶¶ 5-6. Insulet successfully launched the program with ASPN in 2022. The program implemented with ASPN systematized

Insulet's learnings and moved the burdens of aligning insurer and pharmacy requirements from the patient to the Insulet-ASPN system.

Insulet's pharmacy-based approach now represents 100% of Insulet's domestic business operations and is a vital aspect of its business. While several competitors have undertaken their own pharmacy channel initiatives, none has succeeded in catching up to the success of Insulet's model.

## II. Mr. Samara Occupied a Trusted Position at the Heart of the Pharmacy Channel's Development

Mr. Samara was a key contributor to Insulet's pharmacy channel initiative from its inception. Mr. Samara joined Insulet in 2015 as a member of its inside sales team, working directly with patients to understand their needs and preferences and helping them navigate their insurance plans and requirements. When Insulet began exploring the possibility of a pharmacy channel in 2017, Mr. Samara was part of the task force charged with conducting outreach to patients and pharmacies to lay the groundwork for the new channel. Alparone Decl. ¶ 20.

Mr. Samara moved to the role of Commercial Rx Solutions Manager in 2020, and was promoted to Senior Manger, Trade Channel Strategy in 2023. Alparone Decl. ¶ 21. From 2020 until his departure in 2025, Mr. Samara played a crucial role in developing and operationalizing Insulet's pharmacy channel the point person working with ASPN to implement the system Insulet had designed. Alparone Decl. ¶¶ 22-23; Sleeth Decl. ¶¶ 6-7.

In that role, Mr. Samara was a hub for the many spokes of Insulet's pharmacy channel operations and initiatives. Mr. Samara worked closely with Insulet's pharmacy operations team, inside sales, and market access teams to design an actionable decision tree that ASPN could operate on its technology platform. Alparone Decl. ¶¶ 21-23. Mr. Samara worked closely on a daily basis across Insulet's sales function, assessing valuable insights and assessments from various aspects of the pharmacy channel to design the operational blueprint for ASPN. Alparone Decl. ¶ 22. For example, Mr. Samara worked closely with Insulet's pharmacy relationship managers to add pharmacies to ASPN's network and assess the different needs and preferences of Insulet's pharmacy customers to integrate them into Insulet's new channel. *Id.* Through that work, Mr. Samara also developed a close relationship with ASPN, and developed valuable training on working with ASPN, knowing their capabilities and preferences, and leveraging them in combination with Insulet's insights and designs. Alparone Decl. ¶¶ 21-23.

Mr. Samara continued to work closely with ASPN up until his departure from Insulet. Sleeth Decl. ¶ 7. Mr. Samara also owned relationships with other key business partners involved in operating and enhancing Insulet's pharmacy model. Sleeth Decl. ¶ 8. Insulet's partnership with those vendors—and how Insulet worked with them and why—is confidential information that brings significant competitive value to Insulet. *Id.* at ¶ 5.

From 2023 to 2025, Mr. Samara also had access to Insulet's most confidential leadership discussions about strategic business initiatives and growth plans. *Id.* at ¶

11. Mr. Samara was a member of the senior team charged with assessing performance and forward-looking strategic plans for Insulet's market access, sales, marketing, and finance functions to report to Insulet's executive leadership. *Id.* He was also one of nine members of a task force assembled to analyze sales functions across Insulet to identify commercial innovations that would enhance Insulet's business performance. *Id.* When he left Insulet, Mr. Samara had been working to design and implement new programs to enhance patient access within the pharmacy channel. *Id.* at ¶ 9. In that role, Mr. Samara had access to detailed information about payor preferences, insurance plan analyses, and customer data analytics. *Id.* He also had access to Insulet's assessments of that information, and Insulet's strategic plans about how to refine processes and, critically, why. *Id.* at ¶¶ 10-12. In short, Mr. Samara had access to every layer of knowledge needed to operate and refine—or copy—Insulet's market-leading sales system.

### III.    Mr. Samara Executed a Non-Compete Agreement With Insulet

In March 2023, Mr. Samara executed a Confidentiality, Non-Solicit, Non-Compete, and IP Assignment Agreement recognizing that his role granted him access to confidential information and specialized training and opportunities to build relationships with Insulet's customers, vendors, and business contacts.

The Agreement included a variety of provisions to ensure that Insulet's confidential and proprietary information would be protected. Mr. Samara agreed "that items of Confidential Information are the Company's valuable assets and have economic value because they are not generally known by the public or others who

could use them to their own economic benefit and/or to the competitive disadvantage of" Insulet.  Ex. A § 2.  Section 2 of the Agreement requires Mr. Samara to protect Insulet's confidential information and prohibits its unauthorized use or disclosure during and after employment.  Ex. A § 2.

Section 3 of the Agreement includes protective covenants "in order to protect [Insulet's] Confidential Information (including trade secrets) and key business relationships."  Ex. A § 3.  Mr. Samara agreed that during the time he was employed by Insulet and for one (1) year after his employment ends, he would not—either directly or through the direction or control of others:

- "solicit, or attempt to solicit a Covered Customer[1] or Key Relationship[2] … for the purpose of doing any business that would compete with the Company's Business";

- "knowingly engage in any conduct that is intended to cause, or could reasonably be expected to cause a Covered Customer or Key Relationship to stop or reduce doing business with the Company, or that would involve diverting business opportunities away from the Company";

---

[1] "'**Covered Customer**' means a customer or potential customer that I had material business-related contact or dealings with or access to Confidential Information about during the Look Back Period." Ex A § 3.

[2] "'**Key Relationship**' refers to a person or entity with an ongoing business relationship with the Company (including vendors, agents, and contractors) that I had material business-related contact or dealings with during the Look Back Period."  Ex A § 3.

- "provide services for the benefit of a Competing Business within the Territory[3] … that are the same or similar in function or purpose to those [he] provided to the Company during the Look Back Period[4]"; or

- "take on any other responsibilities for a Competing Business that would involve the probable use or disclosure of Confidential Information or the conversion of Covered Customers or Key Relationships to the benefit of a Competing Business or detriment of the Company."

Ex. A § 3.

The Agreement also includes a tolling provision, which extends the one-year period of the Protective Covenant by one day for each day Mr. Samara is found to have violated that provision, up to a maximum of twelve months. Ex. A § 9.

Mr. Samara agreed that Insulet "will suffer irreparable harm, in addition to any damages that can be quantified, by a breach of this Agreement by" him. Ex. A § 5.

## IV.    Mr. Samara Downloaded Confidential Files, Resigned, and Concealed His Destination

Mr. Samara submitted his notice of resignation from Insulet on July 7, 2025. Insulet—concerned that his deep involvement in the pharmacy channel and accumulated confidential information, training, and relationships might flow to a

---

[3] "'**Territory**' means the geographic territory(ies) assigned to me by the Company during the Look Back Period (by state, county, or other recognized geographic boundary used in the Company's Business); and, if I have no such specifically assigned geographic territory then: (i) those states and counties in which I participated in the Company's Business and/or about which I was provided access to Confidential Information during the Look Back Period; and, (ii) the state and county where I reside and the states and counties contiguous thereto." Ex A § 3.

[4] "'**Look Back Period**'" means "the last two years of [Mr. Samara's] employment." Ex. A § 3.

competitor—reminded him of his Agreement obligations and asked about his next employer. Ex. B. He refused to disclose his plans for future employment. *Id.*

Three days later, Insulet discovered that prior to his resignation notice, Mr. Samara had transferred several restricted-access Insulet files to an unauthorized device. O'Brien Decl. ¶¶9-11. These files included the ASPN master services agreement detailing Insulet's pharmacy channel relationship terms, and multiple presentations documenting Insulet's analysis of the variables underlying its pharmacy model and detailing the work streams and process networks required to set up a working pharmacy channel. O'Brien Decl. ¶11; Alparone Decl. ¶¶ 25-29. Insulet also discovered that Mr. Samara had previously downloaded over 80 other restricted-access Insulet documents to unauthorized devices. O'Brien Decl. ¶9.

Upon discovering this exfiltration of valuable confidential information, Insulet immediately terminated Mr. Samara's employment, and demanded destruction of the files he had taken and any other Insulet confidential information. Ex. C at 2. In response, Mr. Samara signed a statement declaring that he had complied with the destruction request and no longer possessed any stolen Insulet documents. Ex. C at 4. Despite Insulet's repeated requests, Mr. Samara again refused to provide any information regarding his next role or employer. Ex. C at 1.

Given Mr. Samara's refusal to indicate his employment plans and his deletion of all his public-facing professional profiles, including his LinkedIn profile, Insulet was left with no option but to trust Mr. Samara's declaration that he had complied with Insulet's destruction request and was complying with the terms of the Agreement.

**V.    Tandem Diabetes Confirms It Has Employed Mr. Samara and Announces an Acceleration of Its Pharmacy Distribution Channel**

Tandem is one of Insulet's biggest competitors.  Sleeth Decl. ¶ 13.  Tandem manufactures and sells insulin delivery devices, including an insulin pump device and disposable infusion sets that pair with its insulin pump device.  Tandem has also been trying, to create its own pharmacy sales channel for years.  Until recently, Tandem's progress in developing a pharmacy channel had been slow.

Although Mr. Samara refused to inform Insulet of his next employment plans, Insulet heard reports that Mr. Samara was working for Tandem.  Once Insulet had reason to believe Mr. Samara was working for one of its biggest competitors, Insulet sent Tandem a letter informing Tandem of Mr. Samara's obligations and restrictions pursuant to his Agreement.  Ex. D.  Tandem's response appeared to confirm that Mr. Samara was working for Tandem and informed Insulet that Tandem was aware of Mr. Samara's contractual obligations to Insulet.  Ex. E.  However, Tandem did not provide any information regarding Mr. Samara's role, duties, or responsibilities at Tandem or how Tandem was ensuring that Mr. Samara was not—and would not—violate the terms of his Agreement with Insulet.

More recently, Tandem's progress on its own pharmacy sales showed a marked acceleration.  Sleeth Decl. ¶¶ 14-15.  What Tandem struggled with for years, it now seems to have solved in just months.

On December 4, Tandem, through counsel, represented to Insulet that it had voluntarily placed Mr. Samara on temporary administrative leave.

## LEGAL STANDARD

A party seeking a preliminary injunction must show: (1) a substantial likelihood of success on the merits; (2) that it will suffer irreparable injury absent an injunction; (3) that the threatened injury to the movant outweighs whatever harm the proposed injunction may cause the opposing party; and (4) if it issued, the injunction would not be adverse to the public interest. *Technomedia Sols., LLC v. Scopetto*, No. 6:13-CV-1061, 2013 WL 6571558, at *6 (M.D. Fla. Dec. 13, 2013); *See Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, (11th Cir. 2009).

## ARGUMENT

Florida law governs the Agreement. Section 6 of the Agreement specifies: "The laws of the state in which the Employee last regularly resided and worked shall govern the interpretation, application, and enforcement of the Agreement." Ex. A § 6. At the time he signed the Agreement, and at the time his employment with Insulet ended, Mr. Samara regularly resided and worked in Florida. Florida law therefore applies to enforcement of the Agreement.

### I.   Insulet Is Substantially Likely To Succeed On The Merits Of Its Breach Of Contract Claim

#### A.   The Protective Covenant Is Valid and Enforceable

Mr. Samara agreed in writing that he would not compete against Insulet for a period of at least one year following the end of his employment at Insulet. Among other things, Mr. Samara expressly agreed he would not provide services for a competing business within the United States that are similar in function or purpose to

those he provided to Insulet in the last two years of his employment, and that he would not engage in conduct that could reasonably be expected to cause "Covered Customers" to reduce doing business with Insulet or convert them to the benefit of a competing business. Ex. A § 3(d)-(f). "Covered Customers" is defined as customers or potential customers with whom Mr. Samara had material business-related dealings in the last two years of his employment at Insulet, or about whom Mr. Samara had access to confidential information. Ex. A § 3.

Those contractual provisions impose reasonably tailored, valid and enforceable restrictions on Mr. Samara's ability to work for an Insulet competitor. Florida law expressly recognizes the enforceability of such restrictive covenants so long as the party enforcing the restriction shows (1) the existence of one or more legitimate business interests justifying the restrictive covenant; and (2) that the contractually specified restraint is reasonably necessary to protect the established interests of the employer. Fla. Stat. Ann. § 542.335; *see also Technomedia*, 2013 WL 6571558, at *10; *Proudfoot Consulting*, 576 F.3d at 1230–31. The Agreement meets both requirements.

i.   <u>Insulet has legitimate business interests justifying the<br>restrictive covenant</u>

As Mr. Samara expressly recognized, the protective covenant is required to protect Insulet's valuable confidential information, including customer relationships and competitively valuable customer information. Ex. A § 1 ("I agree that my receipt of the foregoing would give me an unfair competitive advantage if my activities during

13

employment, and for a reasonable period thereafter, were not restricted as provided for in this Agreement.").

In his role at Insulet, Mr. Samara worked regularly and extensively with Insulet confidential data regarding distributors, partners, vendors, patients, physicians, and retailers. That data included information about what business processes and systems worked or did not work with different stakeholders and why, and what different customers and other stakeholders required or preferred to make their business relationships with Insulet operate smoothly and effectively. Mr. Samara also had access to Insulet's confidential business analyses and strategic plans, including internal pricing models and internal plans on how to optimize and refine the pharmacy channel through pricing and ancillary sales initiatives. Insulet developed that valuable data through years of negotiation and repeated trial and error—trying solutions and relationships that did not work until it gathered enough information to arrive at one that did. Alparone Decl. ¶¶ 14, 17; Sleeth Decl. ¶ 7.

Through his extensive work with Insulet's customers and partners, Mr. Samara also developed significant business relationships with key stakeholders in Insulet's pharmacy model, and became a repository for Insulet's goodwill with those key relationships. Mr. Samara not only knows valuable information about each customer's and partner's preferences, requirements, and capabilities, he also knows the key contacts at each entity, and holds the experience and goodwill to expedite and facilitate relationships between those customers and an Insulet competitor. Sleeth Decl. ¶¶ 7-8.

The business information, customer relationships, and customer goodwill to which Mr. Samara had access during his employment at Insulet are hallmark legitimate business interests that warrant protection via enforcement of a restrictive covenant.  *See* Fla. Stat. § 542.335(1)(b) ("legitimate business interests" include "valuable confidential business information, substantial relationships with specific prospective or existing customers, customer goodwill, and extraordinary or specialized training"); *Technomedia*, 2013 WL 6571558, at *11 (citing *North Am. Prods. Corp. v. Moore,* 196 F.Supp.2d 1217, 1228 (M.D.Fla.2002) (an employer has a legitimate business interest "[w]here an employee ... gains substantial knowledge of h[er] former employer's customers, their purchasing history, and their needs and specifications.")).

    ii.   <u>The restraints imposed by the Agreement are reasonably necessary to protect Insulet's legitimate business interests</u>

Under Florida law, courts should construe restrictive covenants "in favor of providing reasonable protection to all legitimate business interests established by the [party] seeking enforcement."  Fla. Stat. § 542.335(1)(h).  As Mr. Samara agreed, his access to extensive confidential know-how and data, and his relationships with key customers and partners, gave him a competitive edge that—if he were permitted to use them against Insulet—would be unfair and would cause Insulet irreparable harm. Prohibiting Mr. Samara from taking those business relationships and competitively valuable information to a competitor for a period of at least one year is reasonably necessary to protect the many years of work Insulet invested to generate that knowledge and develop those relationships.

The restraints specified in the Agreement are reasonably tailored to what is necessary to protect Insulet's confidential business information and relationships. The restrictions are limited geographically to the territories assigned to Mr. Samara in the last two years of his employment at Insulet. Ex. A § 3 ("'**Territory**' means the geographic territory(ies) assigned to me by the Company during the Look Back Period"). As Senior Manager of Trade Channel Strategy—the position Mr. Samara held throughout the last two years of his time at Insulet—Mr. Samara was assigned responsibilities for refining and overseeing Insulet's pharmacy sales channel across the United States. Setting the United States as the geographic scope for the restrictive covenant is therefore reasonably coextensive with Mr. Samara's role at Insulet. *See, e.g., Proudfoot Consulting*, 576 F.3d at 1239 ("'When the employer's protected interests include information that may be competitively harmful to the employer in any area it competes, then it is reasonable for a non-compete to extend to all areas the employer competes.'" (quoting *Intermetro Indus. Corp. v. Kent*, No. 07–cv–0075, 2007 WL 1140637, at *7 (M.D. Pa. Apr. 17, 2007))); *see also AutoNation, Inc. v. O'Brien*, 347 F. Supp. 2d 1299, 1308-09 (S.D. Fla. 2004) (finding a prohibition on working in "any geographic space in which [former employer] operates" reasonably necessary to protect confidential business information relevant to the markets in which it operates, which included dealerships nationwide).

The restrictive covenant is also limited in time to what is reasonably necessary to protect Insulet's confidential information and relationships from being ported to and leveraged by a competitor. Under Florida law, courts have considered any restraint

under two years to be "reasonable on its face." *Technomedia*, 2013 WL 6571558, at *12 (citing cases); *see also* Fla. Stat. § 542.335(1)(d); *Accellix, Inc. v. Aguilera-Sandoval*, No. 8:25-CV-440, 2025 WL 1069269, at *3 (M.D. Fla. Apr. 8, 2025) (finding a 12-month restriction on solicitation and competition reasonable). The restraints under Section 3 are limited in time to one year following the end of Mr. Samara's employment, tolled for any period during which he is in breach of the provision, for up to twelve months. Ex. A §§ 3, 9. That tolling provision is appropriate to ensure an appropriate cooling-off period between Mr. Samara's work at Insulet and his work for a competitor. *See Perma-Liner Industries, LLC v. D'Hulster*, No. 8:21-CV-715, 2022 WL 1620234, at *8 (M.D. Fla. Feb. 3, 2022), *report and recommendation adopted*, No. 8:21-CV-715, 2022 WL 3138995 (M.D. Fla. Mar. 14, 2022) (finding a two-year restrictive covenant provision reasonable and appropriately tolled for the period the defendant began violating the Noncompetition provision).

Finally, the restraints imposed under Section 3 of the Agreement are reasonably limited to Insulet's line of business. The restrictions extend only to services "that are the same or similar in function or purpose" to the services Mr. Samara provided Insulet in the last two years of employment, and to customers and key relationships with which Mr. Samara dealt in the last two years of his employment or about which he had access to confidential information. Ex. A § 3.

Section 3 of the Agreement imposes limited restrictions necessary to protect Insulet's valuable confidential business information, customer relationships, and relationship goodwill, and should accordingly be enforced. [5]

## B.    Mr. Samara Has Breached the Restrictive Covenant Provisions

Based on the information presently available to Insulet[6], Mr. Samara has joined Tandem—whose sole business is the sale of diabetes care products in direct competition with Insulet.   In October 2025, Insulet became concerned by reports that Mr. Samara was working at Tandem notwithstanding his repeated confirmation that he would abide by the non-compete provisions of his Agreement with Insulet. Prompted by those reports, Insulet wrote a letter to Tandem informing Tandem of Mr. Samara's contractual obligations to Insulet.   Tandem responded that it had spoken with Mr. Samara and it was "confident that Mr. Samara understands his legal obligations and will abide by them in full," thus appearing to confirm that Mr. Samara was employed by Tandem.  Ex. E.

---

[5] To the extent Defendant contests the reasonableness of the restrictive protections, the Agreement is nonetheless enforceable.  Under Florida law, a party seeking to enforce a restrictive covenant need only establish a *prima facie* case that the restraints are reasonably necessary to protect its legitimate business interests.  Having established a *prima facie* case, the burden then shifts to the opposing party to show that the restriction is "overbroad, overlong, or otherwise not reasonably necessary to protect the established legitimate business interest or interests."  Fla. Stat. §§ 542.335(1)(c).  "If a contractually specified restraint is overbroad, overlong, or otherwise not reasonably necessary to protect the legitimate business interest or interests," that does not render the restrictive covenant wholly unenforceable; rather, "a court shall modify the restraint and grant only the relief reasonably necessary to protect such interest or interests."  *Id*.

[6] As described in more detail in Insulet's concurrently filed Motion for Expedited Discovery and Leave to Serve Third Party Subpoena, the full scope of Mr. Samara's breach can be revealed only through discovery.  The facts described herein, however, establish a high likelihood that Mr. Samara has breached the restrictive covenant provisions of his Agreement with Insulet.

Mr. Samara's professional career for at least the past decade has been dedicated to sales of diabetes care products. For the past eight years he has devoted his training and development to establishing a pharmacy channel for Insulet's insulin delivery device. Tandem has been pursuing a pharmacy channel for its insulin delivery devices for years, and has publicly stated that developing a pharmacy channel is a business priority. Ex. F at 14. It is reasonable to infer that Mr. Samara was not offered and did not accept a position outside of his sales background, and it is likewise reasonable to infer that any sales-related position Mr. Samara is performing at Tandem is related to Tandem's stated priority: a pharmacy sales channel. *Gen. Motors Corp. v. Phat Cat Carts, Inc.*, 504 F. Supp. 2d 1278, 1286 (M.D. Fla. 2006) ("circumstantial evidence" is "sufficient to prove" a substantial likelihood to succeed on the merits of their claims); *see also, Access Pro Med., LLC v. Hartman,* No. CV 125-063, 2025 WL 1548745, at *5 (S.D. Ga. May 30, 2025) (when all the "circumstantial evidence points toward breach [of a non-solicitation agreement]," that compels a finding of likelihood of success on the merits); *Westrock Servs., LLC v. Roberts*, No. 1:22-CV-01501-SCJ, 2022 WL 1715964, at *6 (N.D. Ga. May 4, 2022) (finding circumstantial evidence of breach of non-solicitation and a non-competition covenants sufficient to grant preliminary injunction).

Moreover, in November, Tandem's CEO announced the largest advance in its pharmacy channel development to date, and attributed it to having hired talent from other "medtech organizations." Ex. F at 3. Insulet can now only assume Mr. Samara

19

is part of that talent and providing services to develop a pharmacy sales channel similar to those he provided to Insulet, in direct violation of his Agreement.

## II.    Mr. Samara's Breach of the Non-Compete Agreement With Insulet Will Irreparably Harm Insulet

Under Florida law, "[t]he violation of an enforceable restrictive covenant creates a presumption of irreparable injury to the person seeking enforcement of the restrictive covenant."  Section 542.335(1)(j); *Castellano Cosmetic Surgery Center, P.A., v. Rashae Doyle, P.A.*, No. 8:21-cv-1088-KKM-CPT (M.D. Fla. Jul. 28, 2021) (J. Mizelle) at 17 ("Under Florida law, there is a statutory presumption of irreparable injury stemming from the violation of a valid restrictive covenant.").

Even absent that presumption, the Court should find that Mr. Samara's breach of his restrictive covenant with Insulet will cause Insulet irreparable harm.  Mr. Samara had access to extensive Insulet confidential information and training in how to operate a pharmacy channel, including confidential business analyses and strategic plans, internal pricing models and internal plans on how to optimize and refine the pharmacy channel through pricing and ancillary sales initiatives.  Sleeth Decl. ¶ 5.  Mr. Samara's deployment of that confidential information, training, and investment for a competitor constitutes irreparable harm.  *See Lincare v. Markovic*, No. 8:22-CV-918, 2022 WL 18927111, at *9 (M.D. Fla. Nov. 17, 2022) (finding irreparable harm where defendant had access to confidential information before departing company to work for a direct competitor) *report and recommendation adopted*, 2023 WL 2329207 (Jan. 11, 2023); *see also Osborne Associates, Inc. v. Cangemi*, No. 3:17-CV-1135, 2017 WL 5443146, at *15

(M.D. Fla. Nov. 14, 2017) ("Permitting [defendants] to operate their business in direct competition with [plaintiff], and in direct violation of the covenants-not-to-compete they signed, presents a harm that is irreparable.").

Mr. Samara also has a history of downloading and retaining Insulet Confidential Information in violation of the Agreement. O'Brien Decl. ¶¶9-11, 13. Retention and use of confidential information presents additional risk of irreparable harm "because it would allow [defendants] to compete unfairly against the plaintiff." *Foundever Operating Corp. v. Hahn*, No. 8:23-CV-1495, 2023 WL 7496150, at *16 (M.D. Fla. Nov. 13, 2023) (citing *All Star Recruiting Locums, LLC v. Ivy Staffing Solutions*, LLC, No. 21-CV-62221, 2022 WL 2340997, at *17 (S.D. Fla. April 8, 2022)); *see also Vessels v. Dr. Terrazzo of Fla.*, LLC, 352 So. 3d 946, 948-49 (Fla. Dist. Ct. App. 2022).

Mr. Samara also owned relationships with key vendors and partners in his role at Insulet, and had extensive access to competitively sensitive information about Insulet's customers. Sleeth Decl. ¶¶ 5-6, 9. His deep knowledge of how to work with those partners and customers enables him to convert them to Tandem customers and replicate Insulet's confidential business processes for Tandem. The loss of those customers and business relationships would cause Insulet irreparable harm. *See Jysk Bed'N Linen v. Dutta-Roy*, 810 F.3d 767, 780 (11th Cir. 2015).

Finally, Insulet did not unreasonably delay in bringing this motion for preliminary injunction. Despite Insulet's best efforts and repeated questioning of Mr. Samara, Insulet was not able to determine his employer until October 2025. Then, when Insulet reached out to Tandem as a precaution, Tandem assured Insulet that it

was aware of Mr. Samara's ongoing obligations and that Mr. Samara had been reminded of his obligations. That assurance was consistent with Mr. Samara's repeated confirmations after leaving Insulet that we would abide by his Agreement.

However, given Mr. Samara's professional background and the extreme value of the confidential information to which he had access in his senior role at Insulet, Insulet was alert for any indication that Mr. Samara's assurances were false. Tandem's November 6th announcement of its acceleration of its pharmacy sales network and Tandem's CEO's comments attributing the "accelerat[ion]" of its success to having "assembled a skilled team of market access and pharmacy distribution leaders," including from "medtech organizations," gave further cause for concern. Ex. F at 3. Through additional investigation following Tandem's announcement, Insulet discovered in November that Mr. Samara had repeatedly violated Insulet's confidentiality policies by downloading and emailing proprietary and confidential Insulet material to his personal email address. O'Brien Decl. ¶¶ 9-12.

Insulet filed its Complaint on November 28, within two months of confirming Mr. Samara was working at Tandem. That two-month period of investigation does not detract from the irreparable harm that will result if Mr. Samara is permitted to continue deploying his relationships from Insulet and his knowledge of Insulet's confidential processes to continue building Tandem's pharmacy channel, and should not weigh against granting the requested injunction. *See Boggs Contracting, Inc. v. Freismuth*, No. 6:21-cv-2088, 2021 WL 6755466, at *4 (M.D. Fla. Dec. 27, 2021) (finding a delay of 2 months did not negate a finding of irreparable harm); *Larweth v.*

*Magellan Health, Inc.,* 841 F. App'x 146, 158–59 (11th Cir. 2021) (affirming the district court's finding of irreparable harm despite delay because while a "delay in seeking a preliminary injunction should be considered, it's not necessarily fatal." (internal quotations omitted)).[7]

### III.    The Balance of Harms Strongly Favors Insulet

If Mr. Samara is permitted to continue deploying his extensive knowledge of Insulet's confidential processes and business relationships for a competitor, the competitive harm Insulet will suffer will be irreparable.    Sleeth Decl. ¶ 16.    Any hardship that Mr. Samara may experience stems from the bargain he made in his Agreement with Insulet.    *See Edwards Moving & Rigging, Inc. v. Jenkins*, 2020 WL 7707025, at *19 (M.D. Fla. Dec. 29, 2020) ("A defendant who voluntarily enters into a covenant not to compete and receives substantial benefits from his employment . . . cannot now claim that the harm from enforcing the covenant he agreed to would be too great a hardship on him."); *Accellix*,    2025 WL 1069269, at *4 ("Defendant's contractual obligations cannot be ignored simply because the effect may burden him"); *New Horizons Comput. Learning Ctrs., Inc. v. Silicon Valley Training Partners, Inc.*, No. 2:02-cv-459-FTM-29SPC, 2003 WL 23654790, at *7 (M.D. Fla. 2003).

Further, "Florida law favors enforcing contracts without consideration to 'any individualized economic or other hardship that may be caused to the person against

---

[7] As noted *supra* p. 11, on December 4, 2025, Tandem represented through counsel that it had voluntarily placed Mr. Samara on an administrative leave for an unspecified period of time.  That voluntary action, which may be reversed at any time by non-party Tandem, unfortunately does not resolve Insulet's concerns regarding Mr. Samara's actions or the risk of irreparable harm resulting from his breaches of the Agreement between him and Insulet.

whom enforcement is sought.'" *Routeware, Inc. v. Carver*, No. 3:22-CV-634, 2025 WL 2577186 (M.D. Fla. July 25, 2025), *report and recommendation adopted*, No. 3:22-CV-634, 2025 WL 2416479 (M.D. Fla. Aug. 21, 2025) (quoting Fla. Stat. § 542.335(1)(g)). That is especially the case where, as here, there is no "harm" to Mr. Samara, other than having to comply with the restrictions to which he expressly agreed to be bound.

## IV.    Preliminary Enjoining Mr. Samara is In the Public Interest

Florida law recognizes a strong public interest in protecting businesses from unfair competition resulting from former employees breaching their restrictive covenant agreements. *See* Fla. Stat. § 542.335(1)(i) ("No court may refuse enforcement of an otherwise enforceable restrictive covenant on the ground that the contract violates public policy unless...such public policy requirements substantially outweigh the need to protect the legitimate business interests or interests established by the person seeking enforcement").  Indeed, the recently enacted Florida CHOICE Act recognizes that "enforcing strong legal protections in contracts between employers and contracted personnel" encourages "optimal levels of information sharing and training and development," and requires issuance of a preliminary injunction when a covered employer seeks enforcement of a covered noncompete.  Fla. Stat. Ann. § 542.45(5)(a); *cf.  7-Eleven, Inc. v. Kapoor Bros, Inc.*, 977 F. Supp. 2d 1211, 1230 (M.D. Fla. 2013) ("A preliminary injunction enforcing [] restrictive covenants will serve the public interest because enforcement of a valid restrictive covenant encourages parties to adhere to contractual obligations.").  The same public interests favor an injunction in this case.

**V.    To the Extent a Bond is Required, it Should Be Nominal**

A district court "has the discretion to issue a preliminary injunction without requiring Plaintiffs to give security." *Tancogne v. Tomjai Enters. Corp.*, 408 F. Supp. 2d 1237, 1252 (S.D. Fla. 2005); *E-Telequote Ins., Inc. v. Mayberry*, No. 8:22-cv-1222, 2023 WL 3568529, at *3 (M.D. Fla. May 18, 2023).  Here, Insulet is not seeking to prevent Mr. Samara from continuing his employment at Tandem indefinitely or in any role; rather, Insulet is seeking only to prevent Mr. Samara from continuing the breach his Restrictive Covenant Agreement by, *inter alia*, providing services to Tandem similar in function or purpose to those he provided at Insulet.  In situations like this, a nominal bond is appropriate. *Foundever Operating Corp. v. Hahn*, No. 8:23-CV-1495, 2023 WL 7496150, at *20 (M.D. Fla. Nov. 13, 2023) (finding a nominal bond of $5,000 is appropriate when Defendant "did not identify any harm that would result from an injunction prohibiting her from using or disclosing [Plaintiff's] information or soliciting or attempting to solicit [Plaintiff's] customers."); *see also All Star Recruiting*, 2022 WL 2340997, at *20 (holding that "no bond is necessary" when "[t]he Defendants have been ordered to do what they already agreed to do under the terms of their employment agreements.").  As the requested injunction is for a period of up to one year, the bond amount in any event should be no more than Mr. Samara's last annual salary, which Insulet is prepared to disclose for the Court's consideration.

## CONCLUSION

For the foregoing reasons, Insulet's motion should be granted.

Date:  December 5, 2025

OF COUNSEL:

/s/ Robert D. Carroll
Robert D. Carroll (Lead Counsel,
*pro hac vice*)
Scott T. Bluni (*pro hac vice*)
Alexandra Lu (*pro hac vice*)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1753
RCarroll@goodwinlaw.com
SBluni@goodwinlaw.com
ALu@goodwinlaw.com

James Breen (*pro hac vice*)
Danit Maor (*pro hac vice*)
GOODWIN PROCTER LLP
620 Eighth Avenue
New York, NY 10018
(212) 813-8800
JamesBreen@goodwinlaw.com
DMaor@goodwinlaw.com

Respectfully Submitted,

/s/ James M. Matulis
James M. Matulis
Florida Bar No. 77429
MATULIS IP LAW
Chase Professional Park,
10906 Sheldon Road,
Tampa FL 33626
(813) 451-7347
Jim@MatulisLaw.com

*Attorneys for Plaintiff Insulet Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 5, 2025, a true and correct copy of the foregoing was served via CM/ECF on all counsel or parties of record. I further certify that I emailed the foregoing document and the notice of electronic filing to basil.ali.samara@gmail.com and mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participant:

Basil Ali Mohammed Samara
12349 Destin Loop,
Venice, FL 34293

By:    */s/ Robert D. Carroll*
Robert D. Carroll