## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| INSULET CORPORATION,<br><br>              Plaintiff,<br><br>v.<br><br>BASIL ALI MOHAMMED SAMARA,<br><br>              Defendant. | Case No. 8:25-cv-03277-KKM-LSG<br><br>**JURY TRIAL DEMANDED** |

## AMENDED COMPLAINT

Plaintiff Insulet Corporation ("Insulet"), by and through its attorneys, for its Amended Complaint against Basil Ali Mohammed Samara[1] alleges as follows:

1.     This action arises from Defendant's breach of contractual non-disclosure and non-compete obligations owed to Plaintiff.

2.     Mr. Samara worked for Insulet for ten years in a position that required access to confidential information and relationships key to Insulet's business.  As a condition of his employment, Mr. Samara agreed he would not use or disclose Insulet's confidential information, including after his employment ended.  He also agreed he would not go from his position at Insulet to do similar work for an Insulet competitor for a period of at least one year.

---

[1] On information and belief, Defendant uses the name "Basil Samara."  This Amended Complaint will refer to Defendant as "Mr. Samara" or "Basil Samara."

3. On information and belief and as alleged herein, Mr. Samara has breached his agreement with Insulet by (a) working for one of Insulet's most significant competitors, Tandem Diabetes Care, Inc. ("Tandem"), within less than three months of leaving Insulet, and in a function similar to the one he performed at Insulet, and (b) improperly retaining, using, or disclosing Insulet confidential information in violation of his confidentiality obligations.

## I.    THE PARTIES

4. Plaintiff Insulet Corporation is a Delaware corporation with its principal place of business at 100 Nagog Park, Acton, MA 01720.

5. Defendant Basil Ali Mohammed Samara is an individual residing in Venice, Florida.

## II.    JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

7. There is complete diversity between Insulet and Mr. Samara.

8. The amount in controversy is in excess of $75,000. As detailed below, Mr. Samara's breach of his non-compete and confidentiality obligations to Insulet will cause harm that both parties have agreed will be irreparable and, to the extent it can be quantified, will be well in excess of $75,000.

9. This Court has personal jurisdiction over Mr. Samara because he resides within this judicial district in Sarasota County. This Court also has personal jurisdiction over Mr. Samara pursuant to at least Fla. Stat. § 48.193(1)(a)(7) because

he breached a contract in this state by failing to perform acts required by the contract to be performed in this state.

10.     Venue is proper in this district under 28 U.S.C. § 1391(b) because Mr. Samara resides in this judicial district and a substantial part of the events giving rise to the claims at issue occurred in this judicial district.

## III.     FACTUAL ALLEGATIONS

### A.     Insulet Earned a Competitive Edge in the Market for Insulin Delivery Devices After Years of Collecting and Assessing Data to Develop a Pharmacy Sales Channel

11.     Insulet is a renowned innovator in diabetes care.  Founded with the goal of improving the lives of people with diabetes, Insulet developed the world's first tubeless, wearable, disposable insulin patch pump, the Omnipod.  Diabetes is a chronic condition in which the body cannot produce enough insulin or cannot properly use insulin to regulate blood glucose levels.  The Omnipod is a wearable, 2-by-1.5-inch device that delivers insulin into the body.  Users adhere the Omnipod to their body, and the device inserts a soft cannula from the underside of the device into the user's skin.  The device pumps insulin in carefully metered administrations through the soft cannula and into the user's body.  After three days of wear, the user disposes of the device and applies a new one.  In this way, the Omnipod replaces the need for multiple daily injections of insulin through a needle.  The Omnipod was and is a revolutionary device, as it was the first insulin pump that users could wear without the encumbrance of exposed tubing that is traditionally required by other pump devices that deliver insulin.

12.    Insulet is also an innovator in its approach to sales and distribution of its products.  The Omnipod is a medical device prescribed by healthcare providers for the management of diabetes.  Users then need to fill that prescription and pay for the device.  That process can be difficult to navigate and may look different from person to person depending on whether they have health insurance, what the terms of their particular health insurance plan are, and what access they have to various channels of prescription fulfillment.

13.    The variables in the prescription fulfillment process create difficulties on the medical device manufacturers' end as well.  The market for insulin delivery devices is highly competitive; physicians and patients have a range of choices when it comes to picking insulin delivery devices.  Manufacturers spend considerable resources developing and implementing processes that simplify patient access to their products.

14.    The factors regulating patient access are complex, variable, and interrelated.  They include insurance coverage terms and requirements, reimbursement and payment assistance policies, pricing, distribution agreements and logistics, and patient preferences, among others.  Companies have struggled to design their sales channels and sales infrastructure in ways that meet the requirements and preferences of payers, pharmacy benefit managers, healthcare providers, wholesalers, and patients alike.

15.    Historically, manufacturers of insulin delivery devices have structured their sales through Durable Medical Equipment ("DME") channels.  That paradigm typically requires patients to enter multi-year commitments locking them in to a

particular device for several years, and/or imposes high upfront costs that patients sometimes have to pay out-of-pocket even when they have health insurance. Those high upfront costs and commitments can be burdensome to patients, and typically do not allow patients to try a new device before deciding whether it is the best option for them.

16.    Due to the burdens imposed by the DME channel, some medical device companies have tried to forge a new path that smooths the various obstacles that patients typically have to overcome before they can get their hands on a prescribed device.

17.    Insulet is one of the few companies to have succeeded in creating a new path to date. Through years of assessing sales data, patient needs, and physician needs; negotiating and innovating unprecedented, mutually acceptable terms with health insurance providers, pharmacies, and wholesalers; and developing relationships with key stakeholders, Insulet designed a comprehensive model enabling it to be one of the first insulin delivery device companies to make its device available through traditional pharmacy channels.

18.    Insulet launched its pharmacy sales channel in 2020, making the Omnipod available through retail, specialty, and mail-order pharmacy channels. The pharmacy channel significantly smooths the prescription fulfillment process for patients. Users can fill their prescriptions at their usual pharmacy on a pay-as-you-go basis and can test the device on a trial run, avoiding the high upfront costs that attend the old DME channel. Insulet achieved that simplification for its users only by

shouldering itself the complications of establishing a new prescription fulfillment process—through years of assessing and harnessing the many pricing, insurance, support, and distribution variables in a comprehensive sales model accounting for interests and needs across patients, healthcare providers, pharmacy benefit managers, and wholesalers.

19.    In 2022, Omnipod products were the only automated insulin pumps widely available through the pharmacy channel, which eliminated the high upfront cost and four-year lock-in period that is typical with the traditional DME channel, making it simpler for people with type 1 diabetes to access.

20.    Today, 100% of sales of the Omnipod 5 occur only through the pharmacy channel in the United States.  Sales of the Omnipod DASH® are also primarily through the pharmacy channel.

21.    Insulet invested years and tens of millions of dollars to develop its pharmacy distribution channel, including the related confidential and proprietary information, until it was able to produce a system that efficiently and reliably provides patients with access to Omnipod.

22.    Insulet's investment in developing a pharmacy sales channel has proven to be worthwhile.  The implementation of Insulet's pharmacy channel has produced hundreds of millions of dollars in revenue for the company since its full launch in 2019.

23.    In 2024 alone, revenue from the sale of Omnipod products in the U.S. increased nearly $260 million, or roughly 20% over the prior year.  This increase primarily resulted from higher volume through the pharmacy channel driven by a

growth in Insulet's customer base, partially offset by a decrease in estimated inventory days-on-hand at distributors and lower conversions to Omnipod.[2]

24. In 2025, nearly 100% of U.S. sales volume of Omnipod products were through the pharmacy channel.

25. Insulet's pharmacy sales channel has increased patient access to the Omnipod and made Insulet and its employees a target for competitors. While many of its competitors have tried to duplicate Insulet's successful model, to date they have not been able to do so on any meaningful level.

**B. Mr. Samara Held a Position of Trust in Developing Insulet's Pharmacy Sales Channel**

26. Mr. Samara was integrally involved in Insulet's efforts to develop its innovative pharmacy sales channel from its earliest days of conception through the launch of the channel.

27. Mr. Samara joined Insulet in April 2015 as an Inside Sales Manager responsible for onboarding customers and managing sales processes.

28. Insulet began exploring the feasibility of a pharmacy sales channel in 2017. Mr. Samara was involved from the beginning and was part of the leadership team focused on developing the pharmacy channel for Insulet.

29. In May 2020, Mr. Samara's role changed to Commercial Rx Solutions Manager. From 2020 to August 2022, Mr. Samara worked with various sales

---

[2] Insulet Corporation 2024 SEC Form 10-K,
https://www.sec.gov/Archives/edgar/data/1145197/000114519725000007/podd-20241231.htm

departments at Insulet such as pharmacy operations, inside sales, field sales, and contracting, to identify and assess sales data and stakeholder requirements, preferences, and restrictions. The information Mr. Samara collected and assessed included valuable confidential information such as sales analyses, pricing models, service terms, reimbursement analyses, and data about what did and did not work in the various terms and solutions the Insulet team devised and tested with various stakeholders.

30.    Mr. Samara also communicated regularly with key stakeholders—including wholesalers, customers, and vendors—to set up solutions and processes in repeated rounds of trial and error to architect Insulet's eventual pharmacy channel infrastructure. Through his work with Insulet, Mr. Samara came to know the key contacts in each stakeholder channel, what terms they would and would not accept, and which processes and systems work and which processes and systems do not work. All such knowledge constituted and still constitutes Insulet confidential information.

31.    By 2022, Insulet was able to make its latest version of the Omnipod, Omnipod 5, fully available across U.S. retail pharmacy channels.

32.    Thereafter, Mr. Samara continued to work day-to-day with key stakeholders and Insulet's cross-functional sales teams to refine the pharmacy channel.

33.    In 2023, Insulet promoted Mr. Samara to the role of Senior Manager, Trade Channel Strategy. In that role, Mr. Samara was responsible for assessing Insulet's pharmacy channel data and learnings to develop pricing models and

strategies to fine-tune and leverage the pharmacy channel system across Insulet's sales functions.

34.    During his time at Insulet, Mr. Samara worked from Ohio (from 2015 to 2017), Massachusetts (from 2017 to 2020), and Florida (from 2020 to 2025).

**C.    Mr. Samara Signed a Confidentiality and Non-Compete Agreement in Recognition of the Irreparable Harm That Would Result to Insulet if Mr. Samara Took Insulet's Confidential Information and Relationships to a Competitor**

35.    Mr. Samara's role in developing and implementing Insulet's innovative pharmacy channel model involved access to—and creation of—confidential and valuable information belonging to Insulet.

36.    On March 15, 2023, with his last promotion, Mr. Samara signed his currently operative Confidentiality, Non-Solicit, Non-Compete, and IP Assignment Agreement ("Agreement") with Insulet.  That Agreement is attached as Exhibit A.

37.    In the Agreement, Mr. Samara acknowledged that his position at Insulet would afford him access to Confidential Information[3]—including private contract terms, records and data, business plans and strategies and analyses, internal business methods and systems, historical customer data, and unpublished pricing information including variables such as costs, discounting options, and profit margins.  Mr. Samara also acknowledged his position would involve specialized training and the opportunity

---

[3] Capitalized terms not otherwise defined in this Amended Complaint have the meaning assigned to them in the Confidentiality, Non-Solicit, Non-Compete, and IP Assignment Agreement ("Agreement") attached as Exhibit A to this Amended Complaint.

to develop relationships with Insulet's customers, vendors, and other key business contacts.

38.    Mr. Samara's work at Insulet afforded him access to confidential, proprietary, and competitively valuable information.  Among other things, Mr. Samara worked regularly with Insulet's confidential business analyses and strategic plans, customer data, pricing variables and models, and private contract terms.  The value of Insulet's confidential business analyses and strategic plans, customer data, pricing variables and models, and private contract terms is at least in the millions of dollars, far in excess of $75,000.   Therefore, the impermissible use, disclosure, and dissemination of Insulet's confidential, proprietary, and competitively valuable information would harm Insulet and devalue its confidential information in a value that far exceeds $75,000, whether measured by the direct damages to Insulet, the value destroyed by the impermissible disclosure, or the benefit conferred upon Mr. Samara or his new employer.

39.    Through his role at Insulet, Mr. Samara also received specialized training in the new pharmacy channel Insulet forged.  Due to his position of trust at Insulet, Mr. Samara is among a select few in the U.S. that can claim training in setting up and executing a pharmacy distribution channel for an insulin delivery device.

40.    Mr. Samara's role in establishing Insulet's pharmacy distribution channel also brought him into significant relationships with Insulet's customers and, critically, with the primary vendor for its pharmacy channel, ASPN Pharmacies, LLC ("ASPN").   Insulet executed a Master Services Agreement with ASPN to help

implement Insulet's channel in 2022.  Like Mr. Samara, ASPN agreed to maintain Insulet's information as confidential and signed a non-compete provision agreeing that ASPN would not allow any staff connected to work with Insulet to provide services for any third party with respect to insulin delivery devices or systems during the term of the agreement and for a period of time thereafter.

41.    The Agreement Mr. Samara signed with Insulet imposes certain restrictions on Mr. Samara to protect Insulet's valuable confidential information and business relationships.

42.    Section 2 of the Agreement requires Mr. Samara to maintain the confidentiality of Insulet's Confidential Information, and prohibits Mr. Samara from engaging in any unauthorized use or disclosure of such confidential information during his employment and thereafter.  Mr. Samara acknowledged that Insulet's confidential information has economic value because it is not known by others who could use it to their own economic benefit or to the competitive disadvantage of Insulet.  Section 2 also requires Mr. Samara to follow all company policies regarding the use or storage of Insulet records, and to return all Insulet records (including copies) whenever his employment at Insulet ends.  Ex. A § 2.

43.    The Agreement also includes a Protective Covenant, in which Mr. Samara agreed that during the time he was employed by Insulet and for one (1) year after his employment ends, he would not—either directly or through the direction or control of others:

      a.  solicit certain Insulet employees to leave Insulet,

b.  hire, attempt to hire, or assist in hiring certain Insulet employees on behalf of a competing business,

c.  solicit or attempt to solicit a "Covered Customer" or "Key Relationship"—including any customer or vendor that had an ongoing business relationship with Insulet and with whom he had material dealings during his last two years at Insulet—for the purpose of doing any business that would compete with Insulet's business;

d.  knowingly engage in any conduct intended to cause or that could reasonably be expected to cause a Covered Customer or Key Relationship to reduce business with Insulet, or that would involve diverting business opportunities away from Insulet;

e.  provide services for the benefit of a competing business within the U.S. that are the same or similar in function or purpose to those he provided to Insulet during the last two years of his employment; or

f.  take on any other responsibilities for a competing business that would involve the probable use or disclosure of Insulet's confidential information.

Ex. A § 3.

44.    The Agreement also includes a tolling provision, which extends the one-year period of the Protective Covenant by one day for each day Mr. Samara is found to have violated that provision, up to a maximum of twelve months.  Ex. A § 9.

45.    Mr. Samara agreed that if he breached these provisions of the Agreement, that breach would cause Insulet irreparable harm.  Ex. A § 5.

46.    The Agreement's  choice of law provision specifies "[t]he laws of the state in which the Employee last regularly resided and worked shall govern the interpretation, application, and enforcement of the Agreement."  Ex. A § 6.  At the time he signed the Agreement, Mr. Samara last regularly resided and worked in Florida.   Florida law therefore governs the interpretation, application, and enforcement of the Agreement.

**D.    Mr. Samara Resigned From Insulet and Acknowledged His Continuing Confidentiality and Non-Compete Obligations Under the Agreement**

47.    On July 7, 2025, Mr. Samara provided Insulet notice of his resignation from the company.

48.    Given Mr. Samara's extensive involvement in designing and refining Insulet's competitively valuable pharmacy sales channel—and the confidential information and specialized training and relationships he accumulated in that time—Insulet's immediate concern was that Mr. Samara would try to bring that valuable information and experience to a competitor.

49.    Insulet reminded Mr. Samara of his obligations under the Agreement, and asked Mr. Samara where he was going to work next.  Mr. Samara refused to disclose where he intended to work next.

50.    On July 10, 2025, Insulet learned that ten days prior to his resignation, Mr. Samara had downloaded several large Insulet files to his personal computer.

Among these files were the master services agreement between ASPN and Insulet detailing terms of the relationship for Insulet's pharmacy sales channel, and several slide decks detailing Insulet's assessment of the many variables that went into its ultimate model for its pharmacy sales channel. In short, just prior to resigning from Insulet, Mr. Samara had downloaded to his personal device a roadmap for Insulet's pharmacy sales channel.

51.     Upon discovering Mr. Samara's attempt to take with him Insulet's valuable confidential information, Insulet terminated Mr. Samara's employment immediately and demanded he destroy the files he had taken and any other Insulet confidential information he might have taken. Mr. Samara signed a statement declaring he complied with the destruction request, but did not provide any other confirmation that he had permanently destroyed all Insulet confidential information in his possession.

52.     Following the discovery of Mr. Samara's attempt to take with him key documentation of Insulet's pharmacy channel, Insulet also asked Mr. Samara again to disclose what and where his next position was. Mr. Samara again refused to answer.

53.     For months, Insulet was unable to determine whether Mr. Samara was working, and if so, for whom. Before his resignation, Mr. Samara had a LinkedIn profile identifying his role at Insulet. Following his resignation, Mr. Samara deleted his LinkedIn profile. Insulet therefore had to trust Mr. Samara's affirmation that he was complying with his obligations under the Agreement and was not working for a competitor company.

**E.    Tandem Diabetes Care, Inc.**

54.    One of Insulet's biggest competitors is Tandem Diabetes Care, Inc.

55.    Tandem is a California-based company incorporated in Delaware. Tandem's operations are in the U.S.

56.    Like Insulet, Tandem also sells insulin delivery devices. Specifically, Tandem sells an insulin pump device and disposable infusion sets that pair with its insulin pump device.

57.    Tandem has been trying to set up a pharmacy sales channel for years. *See* Ex. B, Mar. 20, 2025 transcript "Tandem Diabetes at Oppenheimer Conference: Strategic Growth Insights" at 8 (noting Tandem had been "looking at the pharmacy opportunity" in "the last twelve to twenty-four months"). Until recently, Tandem's progress in developing a pharmacy channel had been slow. As of June 2025, Tandem had achieved contracts that would make the pharmacy channel available to only 30% of patients. Ex. C, June 10, 2025 transcript "Tandem Diabetes at Goldman Sachs Conference: Strategic Growth Insights" at 22. In an earnings call on November 11, 2025, Tandem's Chief Financial Officer Leigh Vosseller acknowledged that Tandem "came into the pharmacy channel with a lot to learn." Ex. D, Nov. 11, 2025 transcript "Tandem Diabetes at Stifel 2025: Strategic Growth and Market Expansion" at 6.

58.    In November 2025, Tandem's progress appears to have jumped. Tandem had been able to cover only 30% of patients after what it described as years of work. In only a matter of months between June 2025 and November 2025, the number of covered patients in Tandem's pharmacy channel jumped by a third, to 40%. Tandem's

CEO attributed the "accelerat[ion]" of its success to having "assembled a skilled team of market access and pharmacy distribution leaders," including from "medtech organizations." Ex. E, Nov. 6, 2025 transcript "Tandem Diabetes Care, Inc. FQ3 2025 Earnings Call Transcript" at 3.

**F.    Insulet Has Reason to Believe That Mr. Samara Worked at Tandem to Develop Tandem's Pharmacy Sales Channel**

59.    Mr. Samara's repeated refusal to disclose his next position and the deletion of his LinkedIn profile raised concern at Insulet that Mr. Samara had gone to a competitor company notwithstanding his contractual obligations to Insulet.  Insulet eventually heard reports that Mr. Samara was working at Tandem.

60.    Out of caution, Insulet wrote a letter to Tandem seeking confirmation of whether Mr. Samara was working there as rumored, and informing Tandem of Mr. Samara's obligations under the Agreement.

61.    Tandem's response appeared to confirm that Mr. Samara was working at Tandem, and represented that he was aware of his continuing contractual obligations to Insulet.

62.    Insulet's internal cybersecurity team undertook an evaluation of Mr. Samara's Insulet-issued laptop, which Mr. Samara had returned upon his termination as required by the Agreement.  They discovered that in addition to downloading the handful of critical files in the days before his resignation notice, Mr. Samara had also previously downloaded approximately 100 Insulet files to his personal computer, an action the Agreement prohibits.  Like the other documents, these approximately 100

files also included confidential, proprietary, and competitively valuable information about Insulet's pharmacy channel, such as pricing assessments and customer and reimbursement information.

63.     Mr. Samara worked at Tandem.  On information and belief, he provided services for Tandem that were the same or similar in function or purposes to those he provided to Insulet during the last two years of his employment.

64.     Recent public social media posts report patient outreach from Tandem identifying ASPN as Tandem's pharmacy partner.  On information and belief, Mr. Samara worked with ASPN to establish a pharmacy sales channel for Tandem that is similar to Insulet's.

65.     In the quarter-year after Mr. Samara left Insulet, Tandem reported that its "third quarter sales were approximately $176 million, marking [its] highest third quarter to date and [its] second highest quarter ever" after hiring Mr. Samara.  Ex. E, Nov. 6, 2025 transcript "Tandem Diabetes Care, Inc. FQ3 2025 Earnings Call Transcript" at 4.   Tandem attributed this increase to the expansion of the number of covered patients in their pharmacy channel, which increased by a third, to 40%, within months of Mr. Samara leaving Insulet.

66.     Tandem's CEO attributed the rapid expansion of Tandem's pharmacy channel to the "accelerat[ion]" of its success to having "assembled a skilled team of market access and pharmacy distribution leaders," including from "medtech organizations" during earning calls,  Ex. E, Nov. 6, 2025 transcript "Tandem Diabetes Care, Inc. FQ3 2025 Earnings Call Transcript" at 3.

67.     The market for insulin delivery devices is highly competitive, with only a limited number of manufacturers, and therefore gained sales from one often mean lost sales to others.

68.     On information and belief, Mr. Samara's breaches and work for Tandem to develop its pharmacy sales channel have diverted sales away from Insulet and to Tandem that far exceed $75,000.   Even a small percentage increase in Tandem's pharmacy channel attributable to confidential information disclosed by Samara or services provided by Samara to Tandem in breach of the agreement would far exceed $75,000.

**G.    Tandem Severs their Employment Relationship with Mr. Samara After the Filing of this Lawsuit**

69.     On information and belief, after the filing of this lawsuit, Tandem severed its employment relationship with Mr. Samara.

70.     Both Mr. Samara and Tandem represented to Insulet that Mr. Samara's employment has been terminated.

71.     Mr. Samara has refused to provide Insulet any information about the terms of his hiring at Tandem, the position for which he was hired, his severance, or the terms surrounding the severance of his relationship with Tandem.

**COUNT I: BREACH OF THE PROTECTIVE COVENANT (SECTION 3) OF THE AGREEMENT**

72.     Insulet incorporates the preceding paragraphs 1-71 of this Amended Complaint as if fully set forth herein.

73.     The Agreement is a valid and binding written contract.

74.     Insulet has performed its obligations under the Agreement.

75.     Section 3 of the Agreement ("Protective Covenant") restricts Mr. Samara from soliciting certain customers, partners, and vendors—including ASPN—for the purpose of doing any business that would compete with Insulet's business.

76.     Section 3 also prohibits Mr. Samara from knowingly engaging in conduct that could divert business or business opportunities away from Insulet.

77.     Section 3 also restricts Mr. Samara from providing services for an Insulet competitor that are the same or similar in function or purpose to those he provided to Insulet, including services to design, implement, oversee, or refine a pharmacy sales channel for an insulin delivery device or system.

78.     Section 3 also restricts Mr. Samara from taking on any responsibilities for an Insulet competitor that would involve the probable use or disclosure of Insulet's confidential information.

79.     The restrictions of the Protective Covenant apply throughout the United States for a period of one year following the end of Mr. Samara's employment, tolled for up to twelve months for any period during which he is in breach of the provision.

80.     Insulet has legitimate business interests justifying these restrictive provisions, including the protection of valuable confidential business information, substantial relationships with prospective or existing customers or vendors, and customer and vendor goodwill associated with a specific trade area and specialized training.   The restraints specified in Section 3 of the Agreement are reasonably necessary to protect those legitimate business interests.

19

81. On information and belief, Mr. Samara has breached Section 3 of the Agreement by working on developing a pharmacy sales channel for Insulet's competitor, Tandem, within one year of leaving Insulet.

82. On information and belief, Mr. Samara has also breached Section 3 of the Agreement by soliciting customers, wholesalers, retailers, and vendors, including but not limited to ASPN, on behalf of Tandem to do business intended to compete with Insulet.

83. On information and belief, Mr. Samara has also breached Section 3 of the Agreement by knowingly engaging in conduct involving the diversion of business opportunities away from Insulet.

84. On information and belief, Mr. Samara has also breached Section 3 of the Agreement by taking on responsibilities for Tandem that involved the probable use or disclosure of Insulet's confidential information.

85. As a direct and proximate result of Mr. Samara's breach of Section 3 of the Agreement, Insulet has suffered and continues to suffer damages and harm. This harm is ongoing and irreparable through Tandem's use of Insulet's confidential information and must be addressed through, among other things, equitable remedies, including injunctive relief.

86. The competitive harm caused by Mr. Samara's breach, to the extent it can be calculated, is well over $75,000. Insulet invested years of work and well over $75,000 to develop its pharmacy sales channel, which has eased patient access to the Omnipod and resulted in increased new patient starts for the Omnipod. If Mr. Samara

is permitted to breach the Protective Covenant provisions, it will provide Tandem a corner-cutting, toll-free avenue that avoids the high costs Insulet invested in its program, and erode the competitive returns Insulet has earned through its years of extensive investment.

87.    Insulet is also entitled to damages adequate to compensate it for the damages it has suffered as a result of Mr. Samara's material breach of the confidentiality provision, including, but not limited to, lost profits, which are continuing in nature, loss of opportunity and other expectation and/or consequential damages exceeding $75,000.00 (to be determined at trial on this matter).

88.    Further, pursuant to Section 5 of the Agreement, Insulet is entitled to recovery of its attorneys' fees and expenses incurred in seeking relief for Mr. Samara's breach, and expects to expend over $75,000 in enforcing its rights under the Agreement.

## COUNT II: BREACH OF THE CONFIDENTIALITY PROVISIONS (SECTION 2) OF THE AGREEMENT

89.    Insulet incorporates paragraphs 1-71 of this Amended Complaint as if fully set forth herein.

90.    The Agreement is a valid and binding written contract.

91.    Insulet has performed its obligations under the Agreement.

92.    Section 2 of the Agreement requires Mr. Samara to maintain the confidentiality of Insulet's Confidential Information, and prohibits Mr. Samara from

engaging in any unauthorized use or disclosure of such Confidential Information during his employment and thereafter.

93.    Section 2 also requires Mr. Samara to follow all company policies regarding the use or storage of Insulet records, and to return all Insulet records (including copies) whenever his employment at Insulet ends.

94.    On information and belief, Mr. Samara breached Section 2 of the Agreement by using or disclosing Insulet Confidential Information, including confidential and proprietary information about the design, implementation, and operation of Insulet's pharmacy sales channel, without authorization from Insulet.

95.    On information and belief, Mr. Samara breached Section 2 of the Agreement by retaining Insulet records after his employment at Insulet ended.

96.    As a direct and proximate result of Mr. Samara's breach of Section 2 of the Agreement, Insulet has suffered and continues to suffer damages and harm.  This harm is ongoing and irreparable through Tandem's use of Insulet's confidential information and must be addressed through, among other things, equitable remedies, including injunctive relief.

97.    The harm caused by Mr. Samara's breach is well over $75,000.  Insulet invested years of work and well over $75,000 to develop its pharmacy sales channel, and derives over $75,000 of value in maintaining the confidentiality of how that channel works.

98.    Further, pursuant to Section 5 of the Agreement, Insulet is entitled to recovery of its attorneys' fees and expenses incurred in seeking relief for Mr. Samara's

breach, and expects to expend over $75,000 in enforcing its rights under the Agreement.

## **PRAYER FOR RELIEF**

WHEREFORE, Insulet respectfully demands judgment in its favor and against Defendant Mr. Samara as follows:

a)  Enter judgment in favor of Plaintiff on all claims;

b)  Enter an injunction preliminarily and permanently enjoining Defendant from working on pharmacy sales channels for diabetes care products prior to the expiration of the Agreement's protective covenant, or otherwise breaching the protective covenants contained in the Agreement, and extending the one-year restriction period by an additional amount of time equal to the time that Defendant was in breach of Section 3 (as provided under Section 9 of the Agreement);

c)  Enter an injunction preliminarily and permanently enjoining Defendant from using or disclosing Insulet Confidential Information;

d)  Enter an injunction ordering Defendant to produce his personal devices and records for forensic examination to confirm the destruction of Insulet records required by Section 2 of the Agreement;

e)  Award Plaintiff damages in an amount to be proven at trial, plus interest as allowed by applicable law;

f)  Award Plaintiff all costs and reasonable attorneys' fees as allowed by all applicable law and the Agreement; and

g) Grant Plaintiff such other and further relief as the Court deems just and

proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.


Respectfully submitted,


Date: February 2, 2026                    INSULET CORPORATION

By its attorneys:


*/s/ Robert D. Carroll*                    */s/ James M. Matulis*
Robert D. Carroll (Lead Counsel,           James M. Matulis
*pro hac vice forthcoming*)                Florida Bar No. 77429
Scott T. Bluni (*pro hac vice forthcoming*)   MATULIS IP LAW
Alexandra Lu (*pro hac vice forthcoming*)     Chase Professional Park,
GOODWIN PROCTER LLP                        10906 Sheldon Road,
100 Northern Avenue                        Tampa FL 33626
Boston, MA 02210                           (813) 451-7347
RCarroll@goodwinlaw.com                    Jim@MatulisLaw.com
SBluni@goodwinlaw.com
ALu@goodwinlaw.com
(617) 570 - 1753                           *Attorneys for Plaintiff Insulet Corporation*


James Breen (*pro hac vice forthcoming*)
Danit Maor (*pro hac vice forthcoming*)
GOODWIN PROCTER LLP
620 Eighth Avenue
New York, NY 10018
(212) 813-8800
JamesBreen@goodwinlaw.com
DMaor@goodwinlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 2, 2026, a true and correct copy of the

foregoing was served via CM/ECF on all counsel or parties of record.


By:     <u>*/s/ Robert D. Carroll*</u>
        Robert D. Carroll